ROGERS, J., delivered the opinion of the court, in which McKEAGUE, J. joined. DAUGHTREY, J. (pp. 495-503), delivered a separate dissenting opinion.
OPINION
ROGERS, Circuit Judge.
Allied Mechanical Services, a union contractor, filed suit against employee unions and their affiliates claiming that the unions improperly interfered with benefits promised to Allied in an agreement with one of the unions. Allied alleged breach of the collective bargaining agreement and violations under the section of the National Labor Relations Act (NLRA) used to punish so-called secondary boycotts. The district court dismissed Allied’s suit for failure to state any claim upon which relief could be granted, and the National Labor Relations Board (NLRB) later determined that the bringing of the federal suit constituted an unfair labor practice. Applying the substantial evidence test in a way that takes into account this court’s expertise in both the First Amendment and federal litigation, that test is not met. Important First Amendment considerations keep us from upholding the Board’s order in this case.
This suit appears before this court following two related administrative decisions, which concluded that Allied violated § 8(a)(1) of the National Labor Relations Act by bringing a federal suit against a number of local and national labor union entities. An Administrative Law Judge (ALJ), and later the full National Labor Relations Board, concluded that the suit was an unfair labor practice in that it “interfere^] with, restrained], or coerce[d] employees in the exercise of’ their rights to organize and engage in collective bargaining and related activities. See Allied Mech. Servs., Inc., 357 NLRB No. 101, 2011 WL 5374170 (Oct. 25, 2011); 29 U.S.C. §§ 157-58.
Allied Mechanical Services, a Michigan manufacturer and installer of heating, ventilation, and air-conditioning systems, brought the underlying federal lawsuit against several defendants. These included:
• Local 357 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry— the local chapter of plumbers and pipe-fitters, with which Allied had in the past had a tumultuous relationship;
• Local 7 of the Sheet Metal Workers’ International Association — the local chapter of sheet metal workers, with which Allied had not had prior problems; and
• the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO — Local 357’s umbrella organization, with which Allied had not historically dealt directly.
Allied argued that the two local unions colluded to withhold otherwise available job-targeting funds from Allied. The job-targeting-fund program provided union contractors with money that would enable the employers to lower bids on certain jobs so that union contractors could achieve a competitive advantage over non-union contractors. Under the program, Local 7 collected dues from its members, including Allied employees, and used those dues in part to subsidize union contractors who chose to be part of the program.
In February of 1998, Local 7 made job-targeting funds available for a job for the Kalamazoo Red Cross. However, although Allied had previously received job-targeting funds from Local 7, the union *489 did not allow Allied to receive funds for the Red Cross job. Allied claimed that following the Red Cross job, Local 7 denied it job-targeting funds for several other projects, while other union contractors continued to benefit from the program. According to Allied, Local 7’s business agent informed Allied that it would not be eligible for funds on the Red Cross job because Allied had not signed a collective-bargaining agreement with the plumbers and pipe-fitters union (Local 357[1]).
Allied’s history with Local 357 was characterized by labor disputes,[2] and the two had consistently failed to reach a collective-bargaining agreement despite years of negotiations. Based on the information from Local 7’s business manager and on the company’s history with Local 357, Allied concluded that the two local unions and their national counterparts were responsible for illegally keeping Allied from getting the job-targeting funds.
Allied’s complaint, which it filed in the federal district court for the Western District of Michigan, named the two local unions and the national unions. Count 1 alleged that the plumbers and pipe-fitters violated § 8(b)(4) of the NLRA by causing Local 7 to deny job-targeting funds for the jobs. Count 2 alleged that the same provision of the NLRA was violated because the plumbers and pipe-fitters denied Allied the use of the funds and thereby created a “barrier” that “restrain[ed]” it from doing business with potential customers. Count 3 alleged that the local and national sheet metal unions violated § 301 of the NLRA by breaching Local 7’s collective-bargaining agreement with Allied. Finally, Count 4 alleged that the plumbers and pipe-fitters (local and national) “threatened, coerced, or otherwise restrained” Allied’s plumbing and pipe-fitting employees by preventing Local 7 from awarding Allied job-targeting funds, also in violation of § 8(b)(4) of the NLRA.
In a lengthy opinion, the district court dismissed Allied’s complaint in its entirety. A panel of this court affirmed in a per curiam opinion. Allied Mech. Servs., Inc. v. Local 337, 221 F.3d 1333, 2000 WL 924594 (6th Cir.2000). Three of Allied’s claims — the ones pertaining to § 8(b)(4)— alleged, in essence, that the unions violated the so-called “secondary boycott” provisions of the Act, which prohibit any act “whose sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it.” Local 761, Int'l Union of Elec., Radio & Mach. Workers v. NLRB, 366 U.S. 667, 672, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961) (internal quotation marks removed). On de novo review, this court agreed with the district court that any influence exerted by the plumbers and pipe-fitters over Local 7’s use of its job-targeting funds was not sufficient to trigger the protections of the secondary-boycott provisions of the NLRA. Allied Mech. Servs., Inc., 2000 WL 924594, at *4-5. Finally, this court affirmed the district court’s conclusion that Allied’s breach-of-contract claim was not subject to review because an arbitrator had already reached a final and binding decision on the matter within his decision-making authority, under the terms of the CBA. On this claim, our court noted that “[w]ere we free to interpret the contract, or review the claims of factual or legal error, ... we would be *490 inclined to view this claim differently than the [arbitral board].” Id. at *7.
After the litigation concluded, the unions brought an unfair-labor-practice claim before the NLRB, claiming that Allied violated the NLRA by filing the federal suit. On February 21, 2001, an ALJ agreed with the unions and decided that the unions must be reimbursed for their expenses in litigating the federal suit, but denied “the extraordinary remedy of reimbursement to the government and the Charging Parties for their costs in litigating the ... unfair labor practice.” Allied Mech. Servs., Inc., 357 NLRB No. 101, 2011 WL 5374170, at *30. Several parties filed exceptions to that decision, and the full Board reviewed the case.
While the case was pending before the Board, the Supreme Court issued its decision in BE & K Constr. Co. v. NLRB, 536 U.S. 516, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002). That decision added to the body of case law concerning the necessary standards for finding employers liable under the NLRA for civil suits filed against labor unions, and the opinion suggested that a more stringent test may be required to avoid implicating First Amendment concerns related to citizens’ rights to petition the government for the redress of their grievances.[3] Accordingly, the Board remanded to the ALJ for reconsideration in light of BE & K. See Allied Mech. Servs., Inc., 357 NLRB No. 101, 2011 WL 5374170, at *33-40. After the parties filed briefs, the ALJ issued a supplemental decision.
The ALJ adopted and applied a modified test that, in order to violate the NLRA, litigation must be both (1) objectively baseless (as opposed to simply unsuccessful) and (2) retaliatory. In its supplemental decision, the ALJ again concluded that liability under the NLRA was warranted. As to objective baselessness, the supplemental decision stated, “[n]o ‘reasonable litigant’ could realistically expect success on the merits of this lawsuit, filed as it was with no facts ascertained, contract claims clearly precluded by the final and binding arbitration, the obvious primary nature of the disputes, and no evidence whatsoever to connect the two international unions with the events complained of.” Allied Mech. Servs., Inc., 357 NLRB No. 101, 2011 WL 5374170, at *39. The ALJ found the retaliation prong satisfied on the basis of Allied’s history of unfair labor practices against the unions and individual employees, the timing of the lawsuit, “[Respondent’s avowed purpose to ‘get even’ with the unions,” passages in Allied’s pleadings maligning the unions’ and employees’ protected activity, and the lack of a reasonable basis in bringing the suit. Id.
Over the dissent of one member, the NLRB adopted the recommended disposition of the ALJ. Id. at *1-22. Although BE & K stopped short of providing a specific test and focused instead on the type of test that underprotected petitioning rights, the NLRB adopted the ALJ’s modified test, which it viewed as satisfying the Supreme Court’s First Amendment concerns. The Board’s test permits liability only when the challenged legal action was (1) objectively baseless, meaning that no reasonable litigant would have expected to succeed on the merits of the action, and (2) subjectively baseless, in this context meaning that it was intended to retaliate *491 against the union for its protected activity. See BE & K Constr. Co., 351 NLRB 451, 456 (2007). Allied timely sought review in this court.
While the Board defends its legal test and the application of it, Allied argues that the Board’s test for finding liability under § 8(a)(1) of the NLRA underprotects First Amendment rights to file suit in federal court. Allied also challenges the Board’s determination, pursuant to its interpretation of § 8(a)(1), that Allied’s lawsuit was objectively baseless and retaliatory. Finally, Allied challenges the Board’s award of attorneys’ fees and expenses.
This case — invoking as it does First Amendment concerns and facts particularly within the judicial ken — is one of the unusual cases in which the Board’s finding of an unfair labor practice lacks substantial evidence. This court must enforce a Board decision when “the record viewed as a whole provides sufficient evidence for a reasonable factfinder to reach the conclusions the Board has reached.” NLRB v. Galicks, Inc., 671 F.3d 602, 607 (6th Cir.2012) (internal quotation marks omitted). Our application of that scope is of necessity somewhat less deferential in this case, because each of the primary underpinnings for substantial-evidence deference has little force in this context. This is neither a case where the agency is in a better position to find facts, nor a situation where the NLRB’s expertise in labor relations or its special role as a primary source of national labor policy serves as a basis for deference in fact finding. See, e.g., NLRB v. Local Union No. 103, Int’l Ass’n of Bridge, Structural & Ornamental Iron Workers, 434 U.S. 335, 350, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978).
Deference to agency fact finding can be justified partly on the agency’s having heard witnesses and seen the evidence. See generally 2 Richard J. Pierce, Jr., Administrative Law Treatise § 11.2 (5th ed.2010) (discussing the evolution of substantial-evidence review). This rationale does not apply to the question of whether the previous lawsuit in this case was reasonable. We are dealing with, after all, the likelihood of success of a case in federal court, and not with questions of credibility. Drawing inferences from basic facts can be done just as easily — if not more so — by the reviewing court as it can be by the Board.
Deference to the agency is also justified in labor law and in other administrative law contexts by the agency’s expertise and the agency’s primary role as a policy maker. See, e.g., Dickinson v. Zurko, 527 U.S. 150, 160-61, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999); Consolo v. Fed. Mar. Comm’n, 383 U.S. 607, 620-21, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); Rochester Tel. Corp. v. United States, 307 U.S. 125, 145-46, 59 S.Ct. 754, 83 L.Ed. 1147 (1939). It is for these reasons, presumably, that court deference is to the Board rather than the ALJ when the two come to different factual conclusions. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951); UAW v. NLRB, 514 F.3d 574, 580-81 (6th Cir.2008); W.F. Bolin Co. v. NLRB, 70 F.3d 863, 870 (6th Cir.1995). This level of deference is “firmly established ... in cases raising issues of fact not within the conventional experience of judges.” Far East Conference v. United States, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952). In contrast, the instant case deeply implicates the First Amendment right to bring suit, and courts, more than agencies, have expertise in determining the scope of that right, although the Board has presumed expertise in how protecting that right will affect labor relations. The court also has more expertise than the Board in deter *492 mining the objective merit of federal lawsuits.[4]
Related to this “expertise” rationale is the idea that the NLRB is intended to have a primary role in defining labor policy. See NLRB v. Insurance Agents’ Int’l Union, 361 U.S. 477, 499, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); NLRB v. Hartmann Luggage Co., 453 F.2d 178, 183-84 (6th Cir.1971). “[T]he function of striking [the] balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the [NLRB], subject to limited judicial review.” NLRB v. Local Union No. 103, 434 U.S. at 350, 98 S.Ct. 651 (internal quotation marks omitted). The Board “acts in a public capacity to give effect to the declared public policy of the [NLRA] to eliminate and prevent obstructions to interstate commerce by encouraging collective bargaining.” Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 193, 61 S.Ct. 845, 85 L.Ed. 1271 (1941) (internal quotation marks omitted). This concern with policy often has clear applicability when it comes to the Board’s leeway to find facts. Thus, for instance, if the relevant fact is whether an employee was fired for union activity, the fact-related question of how much temporal proximity is required has a policy component: the ease of showing causation may affect how cautious employers will be in taking adverse actions following the union activity. This policy-delegation rationale, however, is also not particularly supportive of deference in the context of this case. Congress has of course largely delegated labor policy to the NLRB, but not necessarily policy regarding First Amendment freedoms. See NLRB v. Insurance Agents, 361 U.S. at 499, 80 S.Ct. 419. It is clear that the Board’s authority does not extend to new “area[s] of regulation which Congress ha[s] not committed to it.” Id. That these First Amendment rights are implicated in these types of labor cases is made clear in the Supreme Court’s discussion in BE & K, which recognized that “whether this class of suits falls outside the scope of the First Amendment’s Petition Clause ... presents a difficult constitutional question.... ” See 536 U.S. at 531-32, 122 S.Ct. 2390.
Thus, in determining whether substantial evidence supports the Board’s decision in this case, our deference is limited by the realization that the purposes for the deference to a large extent do not apply in this case.
When the record as a whole is viewed with the scrutiny warranted by the foregoing considerations, substantial evidence does not support the Board’s conclusion that Allied lacked an objective basis for filing the suit. While Allied may have lost in court, its claims do not sink to the level that no reasonable litigant could have expected to succeed on the merits of the case. See Allied Mechanical Servs., Inc., 357 NLRB No. 101, 2011 WL 5374170, at *12; BE & K, 536 U.S. at 532, 122 S.Ct. 2390. Although the district court granted the unions’ motion to dismiss, and although this court affirmed on de novo review, Allied had reason to believe that it could have succeeded on the merits of the case, at least with respect to the local union entities. And although the organizational *493 structure of the union left Allied without hope of success against the uninvolved international unions, their inclusion in the complaint appears more like thorough law-yering and less like frivolity. Certainly the entire case cannot be made baseless by their erroneous inclusion.
While this court ultimately concluded that the secondary-boycott claims were untenable against organizations that did not engage in commerce with Allied, Allied’s effort to extend the reach of § 8(b)(2) to inter-union coercion was not entirely unreasonable. The Supreme Court recognized that an unsuccessful lawsuit may yet have had an objective basis,
because the genuineness of a grievance does not turn on whether it succeeds. Indeed, this is reflected by our prior cases which have protected petitioning whenever it is genuine, not simply when it triumphs. Nor does the text of the First Amendment speak in terms of successful petitioning&emdash;it speaks simply of “the right of the people ... to petition the Government for a redress of grievances.”
BE & K, 536 U.S. at 532, 122 S.Ct. 2390 (internal citations omitted). There may exist baseless suits in which the plaintiff claims to be seeking an expansion of a legal theory and yet such an expansion is plainly and objectively foreclosed. But this is not such a case.
The function of secondary-boycott protection for employers is twofold: “the preservation of the right of labor organizations to place pressure on employers with whom there is a primary dispute as well as the protection of neutral employers and employees from the labor disputes of others.” Int’l Longshoremen’s Ass’n v. Allied Int’l, Inc., 456 U.S. 212, 223 n. 20, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982). Allied argues that it believed that such pressure, exerted on another union with a relationship with Allied-and a relationship the health of which had a serious effect on Allied’s ability to obtain and conduct its business&emdash;may have been deemed actionable under the secondary-boycott provisions of the NLRA.
Allied conceived of this liability in several possible ways, at least some of which may have been colorable. For example, Allied claimed that Local 357 conducted an illegal secondary boycott by threatening or coercing Local 7 into “eeas[ing] doing business,” 29 U.S.C. § 158(b)(4)(i)(B), with Allied by withholding job-targeting funds. There is logic in this argument, despite the fact that this court ultimately rejected it through a narrow construction of the term “doing business.” See Allied Mech. Servs., 2000 WL 924594, at *5. To be sure, in affirming the district court’s dismissal of Allied’s suit with respect to this claim, this court needed to distance itself from several decisions that lent credence to Allied’s theory. Id. at *5 n. 7 (“We are not persuaded that a contrary result is dictated by the decisions in Limbach Co. v. Sheet Metal Workers International Ass’n, 949 F.2d 1241 (3d Cir.1991) (en banc); Mine Workers (New Beckley Mining Corp.), 138 L.R.R.M. 1334 (1991) enforced Oil F.2d 1470 (D.C.Cir.1992); or George E. Hoffman & Sons, Inc. v. Teamsters Local 627, 617 F.2d 1234 (7th Cir.1980).”). But our narrow construction does not require a conclusion that an alternate, broad construction was not a possible outcome of the litigation. This chance of success&emdash;even if small&emdash;makes clear that Allied’s secondary-boycott claims, while unsuccessful, were not objectively baseless.[5]
*494 This presence of objective basis is in itself enough to warrant reversal if, as Justice Scalia predicted in his concurrence, “in a future appropriate ease, we will construe the [NLRA] ... to prohibit only lawsuits that are both objectively baseless and subjectively intended to abuse process.” BE & K, 536 U.S. at 587, 122 S.Ct. 2390 (Scalia, J., concurring). However, we recognize that the majority opinion in BE & K leaves open the possibility, however unlikely, that liability may still exist even though the unsuccessful suit has an objective basis, if the suit is retaliatory in the heightened sense that the motive is only to impose the costs of litigation on the opposing party. BE & K, 536 U.S. at 536-37, 122 S.Ct. 2390. After stating that “there is nothing in the statutory test indicating that § 158(a)(1) must be read to reach all reasonably based but unsuccessful suits filed with a retaliatory purpose,” the Court nevertheless explicitly declined to “decide whether the Board may declare unlawful any unsuccessful but reasonably based suits that would not have been filed but for a motive to impose the costs of the litigation process.” Id. at 538, 122 S.Ct. 2390. This possibility is problematic because “it poses a difficult question under the First Amendment: whether an executive agency can be given the power to punish a reasonably based suit filed in an Article III court whenever it concludes — insulated from de novo judicial review ... — that the complainant had one motive rather than another.” Id. at 538, 122 S.Ct. 2390 (Scalia, J., concurring). However, we need not address this troubling possibility here, because the NLRB made no finding that Allied’s suit was retaliatory in this stricter sense, nor is there evidence apparent in the record to support such a finding.
The evidence of retaliation cited by the ALJ does not permit the conclusion that Allied brought the suit in order to impose the costs of litigation on the unions. Rather, it shows the more run-of-the-mill type of animus that the Court was reluctant to penalize in its discussion in BE & K. See Id. at 533-35, 122 S.Ct. 2390.[6] The Board cited Allied’s historically “tumultuous relationship with Local 357,” noting Allied’s prior labor-law violations and the conduct that led to those penalties. Allied Mechanical Servs., Inc., 357 NLRB No. 101, 2011 WL 5374170, at *13. The Board also suggested that Allied’s inclusion of the in *495 ternational unions in its complaint was evidence that the suit was driven by the same “hostility” Allied “clearly demonstrated in its relationship with Local 357.” Id. The Board also concluded that “[i]ndependently, the lawsuit was ... retaliatory on its face” because “[i]t sought an award of money damages from the unions based on their statutorily protected conduct — acting in concert to induce [Allied] via lawful pressure to reach an agreement with Local 357.” Id. at *14. The Board found further evidence of retaliatory motive in Allied’s complaint. The Board noted that Allied mentioned the unions’ prior unfair-labor-practices complaints and mini-strikes, and the Board concluded that because of these references the “complaint by its very terms demonstrated that [Allied’s] lawsuit was motivated by a desire to retaliate against the protected activity of Local 357 and the employees it represented.” Id. Finally, the Board cited the evidence of objective baselessness as proof in itself that the suit was subjectively retaliatory in that “the lawsuit’s obvious lack of merit is further evidence that [Allied] sought to retaliate against the Unions by imposing on them the costs and burdens of the litigation process.” Id.
Despite this last conclusory statement, the evidence in the record is not substantial enough to show that Allied’s motive was specifically to punish the unions through litigation costs. Rather, the record indicates that the retaliatory motive, if any, related to the “ill will [that] is not uncommon in litigation.” See BE & K, 536 U.S. at 534, 122 S.Ct. 2390.[7] In BE & K, the Court reaffirmed its precedent that “[d]ebate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred.” Id. (quoting Garrison v. Louisiana, 379 U.S. 64, 73-74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). The evidence cited by the Board may have proved that there was such ill will between Allied and Local 357 as to rise to the level of “hatred.” But none of the evidence offers support for the proposition that Allied’s reasonably based suit was filed without regard for the merits and was instead only intended to cost the unions money.
For the foregoing reasons, we deny the Board’s petition for enforcement of its order.

. Prior to 1998, the plumbers and pipe-fitters were represented by two organizations, Local 337 and Local 357, which merged in March of that year. For purposes of this opinion, we refer to the entities as "Local 357.”

. On four occasions between 1993 and 1998, the NLRB found that Allied had violated the NLRA. See Allied Mech. Servs., Inc., 357 NLRB No. 101, 2011 WL 5374170, at *1-2.

. The Supreme Court recognized that this right is implicated in these cases. For example, in BE & K, the majority made clear that “the genuineness of a grievance does not turn on whether it succeeds” and clarified that "even unsuccessful but reasonably based suits advance some First Amendment rights” such as the “public airing of disputed facts.” 536 U.S. at 532, 122 S.Ct. 2390 (internal quotation marks omitted).

. In his concurrence in BE & K, Justice Sca-lia drew attention to the serious separation-of-powers concerns at play in these cases: "[Giving deference to the NLRB] makes resort to the courts a risky venture, dependent upon the findings of a body that does not have the' independence prescribed for Article III courts. It would be extraordinary to interpret a statute which is silent on this subject to intrude upon the courts' ability to decide for themselves which postulants for their assistance should be punished.” 536 U.S. at 538, 122 S.Ct. 2390 (Scalia, J., concurring).

. The breach-of-contract claim was rejected because of the insufficiency of Allied's allegations that the arbitrator’s determination departed from the essence of the CBA and was *494 not supported by the CBA. Allied’s argument was more colorable then than it would be today. The law of this Circuit was much freer at that time with respect to the ability to review an arbitrator’s interpretation of a contract. For instance, an arbitral decision could be overturned if the award '’conflict[ed] with express terms of the collective bargaining agreement.” Cement Divisions, Nat. Gypsum Co. (Huron) v. United Steelworkers of Am., AFL-CIO-CLC, Local 135, 793 F.2d 759, 766 (6th Cir.1986). Such comparatively nonde-ferential review of arbitral awards was explicitly overruled in Michigan Family Res., Inc. v. Serv. Employees Int’l Union Local 517M, 475 F.3d 746, 753 (6th Cir.2007) (en banc), but that occurred after the litigation at issue in this case.

. The majority did not entirely foreclose the Board’s ability to penalize "unsuccessful suits brought with a retaliatory motive” but held that finding a "retaliatory motive,” without more, was not sufficient with respect to a suit that was unsuccessful but nonetheless objectively reasonable. If such suits are sanctiona-ble, there must be a greater showing of animus. The majority noted that the Board's then-applicable definition of retaliation "broadly cover[ed] a substantial amount of genuine petitioning,” since an employer’s suit challenging union conduct that it reasonably believed to be illegal would nevertheless "interfere with or deter some employees' exercise of NLRA rights.” BE & K, 536 U.S. at 533, 122 S.Ct. 2390. The Court recognized that "[a]s long as a plaintiff's purpose is to stop conduct he reasonably believes is illegal, petitioning is genuine both objectively and subjectively.” Id. at 534, 122 S.Ct. 2390.

. Even Justice Souter, who wrote separately to note that he would limit the extent to which BE & K is read to encourage a strict test, warned that the Board cannot find " 'retaliatory motive' almost exclusively [based] upon the simple fact that the employer filed a reasonably based but unsuccessful lawsuit and the employer did not like the union.” 536 U.S. at 539, 122 S.Ct. 2390 (Souter, J., concurring). He and the three Justices who joined him left open the possibility that “the evidence of 'retaliation' or antiunion motive might be stronger or different, showing, for example, an employer, indifferent to outcome, who intends the reasonably based but unsuccessful lawsuit simply to impose litigation costs on the union.” Id.