NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0627n.06

No. 20-3222

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DAVID GEARHART,

     Plaintiff-Appellant,

v.

E. I. DU PONT DE NEMOURS AND
CO.,

     Defendant-Appellee.

FILED
Nov 04, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF
OHIO

BEFORE:    GUY, CLAY, and KETHLEDGE, Circuit Judges.

     **CLAY, Circuit Judge.** Plaintiff David Gearhart claims that his former employer, E. I. du Pont de Nemours and Company ("DuPont"), violated his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and related Ohio state law statutes. Following the district court's grant of summary judgment to DuPont, Gearhart appealed. For the reasons set forth below, we **AFFIRM** the district court's grant of summary judgment.

BACKGROUND

     Gearhart began working in 2012 as a Kapton Casting Operator for DuPont at its Circleville, Ohio facility. One of his duties was entering and cleaning the Kapton oven, a task that took anywhere from thirty minutes to a full twelve hour shift to complete. When cleaning the oven, Kapton Casting Operators wore personal protective equipment ("PPE") weighing approximately thirty to thirty-five pounds to protect them from the heat of the Kapton oven—generally about

140 to 150 degrees Fahrenheit when being cleaned. Due to the nature of this work, DuPont required Kapton Casting Operators to have medical clearance. During the relevant timeframe, the DuPont plant physician, who was not a DuPont employee but rather provided medical services at DuPont on behalf of a third-party contractor, was Dr. Brent Cale.

On May 7, 2014, Gearhart underwent triple bypass surgery after suffering a heart attack. Following his surgery, Gearhart was on medical leave for close to five months, and he was not cleared for oven entry until November 11, 2014. More than two years after his triple bypass surgery, on July 9, 2016, Gearhart was again hospitalized for cardiac treatment. Following his discharge, on July 19, 2016, Gearhart's primary care physician, Dr. Jaya Thakur, authorized him "to do regular office work (his regular job) but no overtime for a month."[1] (Def. Ex. 18, R. 22-8 at PageID #282; Gearhart Dep., R. 22-1 at PageID #128.) Dr. Thakur also referred Gearhart to Dr. Douglas Magorien, a cardiologist, who, after examining Gearhart on August 11, 2016, sent a report to Dr. Thakur in which he stated that, "[d]ue to the patient['s] cardiac history he should not work in an oven with high temperatures." (Ex. 4, Cale Dep., R. 23-3 at PageID #388; Cale Dep., R. 23-1 at PageID #353.) Gearhart told Dr. Magorien that he did not "need" or "want" the diagnosis "in writing," and Dr. Magorien's report was not provided to Dr. Cale or DuPont. (Gearhart Dep., R. 22-1 at PageID #130.)

Gearhart's return to work did not last long. On August 2, 2016, Gearhart had umbilical hernia surgery and was out of work for approximately four to six weeks more. While Gearhart was off work following his hernia surgery, he allegedly had some discussions with several members of the DuPont medical staff. Gearhart's plant medical chart shows that on August 12, 2016, Gearhart informed Jennifer Baldwin, a DuPont human resources and medical employee, that his cardiologist

---

[1] Since Dr. Thakur "knew exactly what [Gearhart's] job was" at DuPont, her reference to "regular office work" may have been erroneous. (Gearhart Dep., R. 22-1 at PageID #128.)

told him that he could "never go in the oven again." (Medical Chart, R. 23-3 at PageID #409.) Gearhart denied making that statement. The chart also contains a record from August 16, 2016, in which Nurse Jennifer Stone reported that Gearhart told her that his "cardiologist does not want him in the oven again." (Medical Chart, R. 23-3 at PageID #409.) According to Nurse Stone, Gearhart notified her that his cardiologist was "worried about the heat and stress on [his] heart" because of his "coronary artery disease" and "cardiac history," and that his cardiologist was "worried about the PPE too." (*Id.*)

On August 23, 2016, Gearhart's hernia surgery was evaluated by Dr. Cale. In addition to discussing Gearhart's hernia, Dr. Cale's entry on Gearhart's medical chart states that Gearhart reported "to DuPont Medical Staff (& to me today) that his cardiologist is not comfortable with him working in the oven due to his cardiac disease. [Gearhart's] cardiologist did not put this in writing, because [the patient] specifically told him not to put it in writing." (Medical Chart, R. 23-3 at PageID #408.) As Dr. Cale "believe[d] this advice to be medically appropriate," the evaluation concluded with Dr. Cale issuing Gearhart "a permanent restriction from working in the oven." (*Id.*) According to Gearhart, however, he only told Dr. Cale that his "cardiologist doesn't think anybody ought to go into an oven." (Gearhart Dep., R. 22-1 at PageID #129.)

Because Gearhart was restricted from oven entry, DuPont's interactive accommodation review process was activated. On September 7, 2016, a meeting was attended by Gearhart; Mike Dutton, a DuPont human resources manager; Tim Anderson, Gearhart's supervisor; and Curt Forquer and Chris Dillhoff, two area managers. At the meeting, according to the interactive accommodation review template ("IART"),[2] it was agreed that Gearhart was permanently restricted from oven work and the idea of progressing him to a Level 4 Chemical / Solvent

---

[2] The IART is a form DuPont uses "[t]o document discussions and ultimately the output or the result of the potential accommodations for a medical restriction." (Dutton Dep., R. 27-1 at PageID #770.)

Recovery Operator position was discussed as a potential accommodation. The two area managers explained, however, that DuPont's seniority rules would likely not allow Gearhart to obtain this position. At this meeting, alternate solutions were also discussed, including assigning Gearhart to a Tedlar Operator position, but it was determined that none of the operator jobs would allow Gearhart to avoid oven work.

Another meeting was held on October 12, 2016. Gearhart, Dutton, Forquer, Dillhoff, and Don Williams, a supervisor, attended the meeting. At this meeting, assigning Gearhart to a role dedicated exclusively to dumping monomers was discussed as a potential accommodation. The two area managers agreed that placing Gearhart in this role would work as a short-term accommodation because there was a "near-term shortage of Operators trained and qualified to dump monomers," but that it was not reasonable as a long-term accommodation because there was no such position dedicated exclusively to this role. (Def. Ex. 32, R. 22-12 at PageID #298.)

On November 7, 2016, after Gearhart again brought up working as a Tedlar Operator, the medical staff was contacted to determine if Gearhart's oven restriction included the Tedlar oven. After speaking to the Tedlar area manager and an occupational health specialist "who compared the job duties/physical demands of the [Kapton Operator and Tedlar Operator] jobs," Nurse Stone noted that "[b]oth had temperatures at or above 95 F, both wear full Butyl suits, both are strenuous" and that she would "discuss this with Dr. Cale tomorrow." (Medical Chart, R. 23-3 at PageID ##406–07.) The next day, the Tedlar area manager, the occupational health specialist, and Dr. Cale all had a discussion. At the end of the meeting, after "review[ing] the differences of the workload/PPE at each location," Dr. Cale concluded that "if an employee is restricted from the oven in Kapton, they will be restricted from the oven in Tedlar." (*Id.*)

On December 2, 2016, Dutton and Forquer met to review the IART and confirm the conclusions reached during the review process. No additional potential accommodations were identified at this meeting. Assigning Gearhart to a Tedlar Operator position was again raised as an alternate solution but, following the discussion with Dr. Cale, it was rejected because it required oven work as an essential function of the position. It was also determined at the meeting that it was no longer reasonable to assign Gearhart to a temporary role dedicated exclusively to monomer dumping because there was no longer a shortage of trained operators.

That same day, Gearhart informed DuPont that he had "been placed off work for one month by [his] doctor" due to back issues. (Medical Chart, R. 23-3 at PageID #402.) In January 2017, Gearhart applied for long-term disability benefits. Because DuPont concluded that it could not accommodate Gearhart's restriction of "no oven work," on February 3, 2017, Gearhart was notified that his employment would be terminated once his eligibility for long-term disability benefits was determined. (Def. Ex. 32, R. 22-12 at PageID ##297, 300–01.) DuPont officially terminated Gearhart's employment on February 8, 2017, after he was approved for long-term disability benefits. After about five months on long term disability, Gearhart discontinued the benefits because he accepted another job.

On September 29, 2017, Gearhart filed a Complaint against DuPont in the United States District Court for the Southern District of Ohio. As the district court explained, "[i]n his Complaint, [Gearhart] alleges the following claims: Americans with Disabilities Act (ADA) failure to accommodate (Count 1), ADA disparate treatment (Count 2), ADA perception of disability, which the Court interpret[ed] as a disability discrimination claim (Count 3), Ohio state law failure to accommodate (Count 4), Ohio state law disparate treatment (Count 5), Ohio state law perception of disability (Count 6), and Age Discrimination in Employment Act (ADEA) disparate treatment

(Count 7)."[3] *Gearhart v. E.I. DuPont de Nemours & Co.*, No. 17-856, 2019 WL 7290497, at *3 (S.D. Ohio Dec. 30, 2019). DuPont moved for summary judgment on all of Gearhart's claims. On December 30, 2019, the district court granted the motion as to all counts and dismissed the case. This timely appeal followed.

## DISCUSSION

"We review a grant of summary judgment *de novo*, construing the evidence and drawing all reasonable inferences in favor of the nonmoving party." *Rocheleau v. Elder Living Const., LLC*, 814 F.3d 398, 400 (6th Cir. 2016) (quoting *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011)). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Payne v. Novartis Pharm. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(a) & (c)). "The moving party bears the burden of showing that no genuine issues of material fact exist." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516–17 (6th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986)). "Whether a fact is 'material' depends on whether its resolution might affect the outcome of the case." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne*, 767 F.3d at 530 (citing *Anderson*, 477 U.S. at 251–52).

---

[3] The district court held that Gearhart abandoned his ADEA claim and, accordingly, granted summary judgment without considering the merits of the claim. *Gearhart*, 2019 WL 7290497, at *3–4. In his briefing, Gearhart concedes that he is not pursuing his ADEA claim.

The ADA prohibits employment discrimination against a "qualified individual on the basis of disability."[4] 42 U.S.C. § 12112(a). A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "An employer's decision to discharge an employee on the basis of disability or an employer's failure to provide a reasonable accommodation can constitute the type of unlawful discrimination barred by the statute." *Cash v. Siegel-Robert, Inc.*, 548 F. App'x 330, 334 (6th Cir. 2013) (citing *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013)).

"There are two ways that a litigant can prove discrimination—directly or indirectly—each with its own test." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018) (citing *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016)). "[T]he direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004) (quoting *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348–49 (6th Cir. 1997)). Accordingly, "[d]istinguishing between cases that involve direct evidence of discrimination and those in which the plaintiff is not able to introduce direct evidence is vital." *Hostettler*, 895 F.3d at 852 (quoting *Ferrari*, 826 F.3d at 892).

Gearhart argues that he can prevail under both the direct evidence and the circumstantial evidence frameworks. However, we have repeatedly held that "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the

---

[4] We need not separately consider Gearhart's state law claims because the "analysis of claims made pursuant to the Americans with Disabilities Act applies to claims made pursuant to Ohio Revised Code § 4112.02." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010) (citations omitted); *see also Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 n.3 (6th Cir. 2008) ("[W]e consider the ADA and [Ohio] state law claims simultaneously by looking to the cases and regulations that interpret the ADA.").

failure to accommodate) of discrimination."[5] *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (citing *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1283 (7th Cir. 1996)); *see also Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416–17 (6th Cir. 2020); *Hostettler*, 895 F.3d at 853. This is because the employer, DuPont in this case, acknowledges that its employment decision was based on the employee's disability so "if the fact-finder accepts the employee's version of the facts, no inference is necessary to conclude that the employee has proven this form of discrimination." *Kleiber*, 485 F.3d at 868 (citations omitted); *see also Fisher*, 951 F.3d at 416.

"Under the direct-evidence framework, [Gearhart] bears the burden of establishing (1) that he is disabled, and (2) that he is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Fisher*, 951 F.3d at 417 (quoting *Kleiber*, 485 F.3d at 869).

---

[5] Gearhart seeks to differentiate DuPont's alleged failure to accommodate—which he asserts should be analyzed under the direct-evidence framework—from his termination after DuPont determined that it could not accommodate his disability—which he argues constituted disparate treatment and should be analyzed under the *McDonnell Douglas* burden-shifting test. However, Gearhart's disparate treatment claims are premised on DuPont allegedly accommodating other employees' medical conditions but failing to accommodate his disability. *See Kleiber*, 485 F.3d at 868 (citing *Bultemeyer*, 100 F.3d at 1283). Moreover, DuPont concedes that it terminated Gearhart's employment because of his disability; it determined that Gearhart's disability rendered him not qualified to perform the essential functions of a Kapton Casting Operator position and that there were no available reasonable accommodations. And "[w]hen an employer acknowledges that it relied upon the plaintiff's handicap in making its employment decision, the *McDonnell Douglas* burden shifting approach is unnecessary because . . . the plaintiff has direct evidence of discrimination on the basis of his or her disability." *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 297–98 (6th Cir. 2019) (citation and internal quotation marks omitted). Therefore, only the direct evidence framework applies to Gearhart's claims. *See Kleiber*, 485 F.3d at 867–69 (applying only the direct evidence framework when an employee was discharged after his employer concluded that it could not accommodate his disability); *see also Fisher*, 951 F.3d at 415–17; *Hostettler*, 895 F.3d at 851–53. In any event, the *McDonnell Douglas* test also requires the employee to show that "he or she is otherwise qualified for the position, with or without reasonable accommodation," which, as will be explained, is a burden Gearhart has not met. *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019) (quoting *Ferrari*, 826 F.3d at 891–92).

For purposes of summary judgment, the parties do not contest that Gearhart was disabled.[6] Instead, the parties dispute: (1) whether Gearhart was "otherwise qualified" for his position as a Kapton Casting Operator without a reasonable accommodation; (2) whether DuPont failed to provide a reasonable accommodation; and (3) whether DuPont failed to engage in the ADA's mandatory interactive process for determining how best to accommodate Gearhart's disability.

## I. Otherwise Qualified

Gearhart argues that whether he was otherwise qualified without any accommodation is a disputed issue of fact because there "is no direct evidence that [he] was ever restricted from working in an oven by any of his medical providers at the time the employer's on site Doctor permanently restricted [him] from any oven work." (Appellant Brief at 1.) "In cases in which the plaintiff is claiming to be qualified to perform the essential functions of the job without reasonable accommodation, and the employer's defense is that the employee's handicap precludes satisfactory job performance, objective evidence will suffice to establish the fact in question; namely whether the employee's handicap renders him or her unqualified to perform the essential functions of the job." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1182–83 (6th Cir. 1996), *abrogated on other grounds*, *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012); *see also* 42 U.S.C § 12111(8). As Gearhart concedes that oven entry was an essential function of a Kapton Casting Operator position, to survive summary judgment, Gearhart was required to point to objective evidence sufficient for a reasonable jury to find that, despite his heart issues, he could enter the Kapton oven without an accommodation.

---

[6] "The term 'disability' . . . with respect to an individual" includes someone who is "regarded as having" an impairment. 42 U.S.C. § 12102(1). Because, for purposes of summary judgment, DuPont concedes that Gearhart had a disability, we do not need to separately address Gearhart's perception of disability claims.

On August 12, 2016, Gearhart's plant medical chart reflects that he informed Baldwin that his cardiologist told him that he could "never go in the oven again." (Medical Chart, R. 23-3 at PageID #409.) Four days later, Nurse Stone reported on the chart that Gearhart told her that his "cardiologist does not want him in the oven again." (Medical Chart, R. 23-3 at PageID #409.) Dr. Cale's notes from August 23, 2016 state that Gearhart reported that his "cardiologist is not comfortable with him working in the oven due to his cardiac disease." (Medical Chart, R. 23-3 at PageID #408.)

In his deposition, Gearhart disputed this evidence. He denied talking to Baldwin or Stone about his cardiologist, and he testified that he only told Dr. Cale that his cardiologist was "not comfortable with anyone going into the oven." (Gearhart Dep., R. 22-1 at PageID #130.) Because Dr. Cale's decision to restrict Gearhart from entering the Kapton oven was based upon Gearhart reportedly telling him that his cardiologist was "not comfortable with him working in the oven"—"advice" that Dr. Cale believed to be "medically appropriate"—Gearhart relies on his deposition testimony to assert that there is a disputed issue of material fact as to whether Dr. Cale's restriction was reasonable. (Medical Chart, R. 23-3 at PageID #408.)

However, Gearhart also testified at his deposition that Dr. Magorien "was uncomfortable with me working in a high temperature oven," (Gearhart Dep., R. 22-1 at PageID #130), and "[c]ourts have repeatedly held that a plaintiff's internally contradictory deposition testimony cannot, by itself, create a genuine dispute of material fact," *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 449 (6th Cir. 2017) (collecting cases).

More significantly, the contemporaneous records of Gearhart's disputed communications with three members of the DuPont medical staff on three separate days is not the only evidence of his qualification to work in the oven. Putting aside the issue of what Dr. Cale knew when he

rendered his medical opinion,[7] the undisputed medical evidence shows that Gearhart's heart condition rendered him unqualified to enter the Kapton oven. One day before Gearhart's plant medical chart reflects that he told Baldwin that he could "never go in the oven again," (Medical Chart, R. 23-3 at PageID #409), on August 11, 2016, Dr. Magorien wrote a report detailing the "changes" in Gearhart's "condition," (Ex. 4, Cale Dep., R. 23-3 at PageID #386). In the Assessment/Plan section of his report, Dr. Magorien wrote that "[d]ue to the patient['s] cardiac history he should not work in an oven with high temperatures."[8] (*Id.* at PageID #388.) Therefore, because Gearhart's own cardiologist stated that he was unable to work in the oven, we do not believe that Gearhart has created a genuine dispute as to his qualification to perform this essential function of a Kapton Casting Operator position. *See Aston v. Tapco Int'l Corp.*, 631 F. App'x 292, 296–97 (6th Cir. 2015); *cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

**II. Reasonable Accommodation**

Because Gearhart was not otherwise qualified to work in the Kapton oven without an accommodation, the relevant question is whether DuPont complied with the ADA's requirement to "mak[e] reasonable accommodations." 42 U.S.C. § 12112(b)(5)(A). "The plaintiff bears the

_____

[7] We note, however, that although Dr. Cale was unaware of Dr. Magorien's examination and diagnosis, it is undisputed that Dr. Cale was aware of Gearhart's medical history, including his triple bypass surgery in 2014 and his hospitalization in 2016.

[8] Gearhart argues that "nowhere in the record is there any definition or quantitative statement by Dr. Magorien as to what is a 'high temperature.'" (Appellant Brief at 10.) Dr. Magorien's assessment that Gearhart should not work in an oven with high temperatures was titled a "Work restriction." (Ex. 4, Cale Dep., R. 23-3 at PageID #388.) Presumably, Dr. Magorien was aware of the nature of Gearhart's work and, when he restricted Gearhart from working in ovens with high temperatures, he meant the oven in which Gearhart worked. It is simply implausible to believe that Dr. Magorien was referring only to ovens hotter than those Gearhart was required to enter for work.

initial burden of showing 'that an "accommodation" seems reasonable on its face, *i.e.*, ordinarily or in the run of cases.'" *Fisher*, 951 F.3d at 419 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)). "Once the plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances," *Barnett*, 535 U.S. at 402 (citations omitted), "or that the proposed accommodation eliminates an essential job requirement," *Fisher*, 951 F.3d at 419 (citing *Kleiber*, 485 F.3d at 869).

In his briefing, Gearhart identifies three potential positions that he argues DuPont could have reassigned him to once DuPont determined that he was not otherwise qualified to perform an essential function of a Kapton Casting Operator position: (1) progressing him to a Level 4 Chemical / Solvent Recovery Operator position; (2) assigning him to a role dedicated exclusively to monomer dumping; and (3) transferring him to a Tedlar Operator position.[9] "If one of these three accommodations passes muster, summary judgment in [DuPont's] favor is not appropriate." *Id.* at 419.

A "reasonable accommodation" under the ADA may include "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). "Consequently, 'an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified.'" *Kleiber*, 485 F.3d at 869 (quoting *Burns v. Coca–Cola Enters., Inc.*, 222 F.3d 247, 257

---

[9] DuPont argues that in the district court Gearhart only challenged DuPont's failure to accommodate him by transferring him to a position working in the Tedlar oven and that, accordingly, he waived arguing the other two potential accommodations. Although Gearhart's response to DuPont's Motion for Summary Judgment stated that he "does not challenge 1 & 2," it appears from context, and as Gearhart now argues, that this statement was Gearhart's inartful way of asserting that he "does not challenge [that] 1 & 2" were listed on the IART as potential accommodations. (Pl. Resp. to Def.'s Mot. for Summ. Judgment, R. 32 at PageID #1050.)

(6th Cir. 2000)). However, the ADA does not require an employer to "waive legitimate, non-discriminatory employment policies[,] displace other employees' rights to be considered in order to accommodate the disabled individual," or "create new jobs . . . in order to accommodate a disabled individual." *Burns*, 222 F.3d at 257 (citations omitted); *see also Rorrer v. City of Stow*, 743 F.3d 1025, 1039, 1045 (6th Cir. 2014) (explaining that an employer can be required to modify a job description to accommodate an employee if the modification would not require any change in "essential" job duties.).

As to Gearhart's first proposed potential accommodation, the Supreme Court has explained that an employer's showing that the proposed accommodation "would violate the rules of a seniority system warrant summary judgment for the employer" unless there are "special circumstances surrounding the particular case that demonstrate the assignment is nonetheless reasonable." *Barnett*, 535 U.S. at 406. Gearhart has not disputed DuPont's evidence that assigning him to a Level 4 Chemical / Solvent Recovery Operator position would have violated the rules of its established seniority system, and Gearhart has not presented any special circumstances showing why "an exception to [DuPont's] seniority policy can constitute a 'reasonable accommodation' even though in the ordinary case it cannot." *Barnett*, 535 U.S. at 406. Gearhart's proposed accommodation, therefore, does not allow him to survive summary judgment.

Gearhart cannot avoid summary judgment based on DuPont's refusal to transfer him to a position dedicated exclusively to monomer dumping because a reasonable accommodation only includes reassignment to a vacant position, *see* 42 U.S.C. § 12111(9)(B), and Gearhart does not dispute that DuPont did not have a vacant position dedicated exclusively to monomer dumping. Gearhart argues that DuPont has not shown that increasing staffing would have been an undue

hardship; however, an employer's burden to show undue hardship only arises after the employee identifies a *reasonable* accommodation. *See Fisher*, 951 F.3d at 420–421.

Finally, Gearhart argues that transferring him to a Tedlar Operator position was a reasonable accommodation because those ovens have lower temperatures, and the operators wear lighter equipment, than in the Kapton area. Although DuPont determined that transferring Gearhart to a Tedlar Operator position would not be feasible because those jobs also require oven work, Gearhart argues that because, at Dr. Cale's deposition, he did not know the temperature and equipment differences between the Kapton and Tedlar ovens, DuPont's rejection of this proposed accommodation was not objectively reasonable.

However, "an ADA plaintiff 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Kleiber*, 485 F.3d at 870 (quoting *Hedrick*, 355 F.3d at 457). When the plaintiff argues that he was denied a job transfer as a reasonable accommodation, "to overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position." *Id.* (citing *Burns*, 222 F.3d at 258–59). Gearhart's claim fails because the record evidence does not create a genuine issue of material fact regarding his qualifications to work in the Tedlar oven. The undisputed evidence shows that Gearhart was restricted from working in ovens with high temperatures and that, while the Tedlar oven was not as hot as the Kapton oven, it was hot enough that Tedlar Operators were required to wear specialized PPE. Besides his subjective belief that he was, nonetheless, qualified to work in the Tedlar oven, Gearhart did not present any evidence demonstrating that it was safe for him to work in the Tedlar oven.[10] Therefore, we do not believe that a reasonable jury could conclude that Gearhart was qualified for a position at DuPont.

---

[10] Moreover, what Dr. Cale remembered at his January 24, 2019 deposition is irrelevant because Gearhart's contemporaneous plant medical records, which Gearhart has not disputed, demonstrate that Dr.

**III. Failure to Engage in the Interactive Process**

Gearhart further argues that DuPont's failure to participate in the interactive process in good faith was the reason for his inability to identify a reasonable accommodation that would qualify him for a position at DuPont. "Once an employee requests an accommodation, the employer has a duty to engage in an interactive process." *Hostettler*, 895 F.3d at 857; *see also* 29 C.F.R. § 1630.2(o)(3). "From that point, 'both parties have a duty to participate in good faith.'" *Fisher*, 951 F.3d at 421 (quoting *Kleiber*, 485 F.3d at 871). The purpose of the interactive process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Kleiber*, 485 F.3d at 871 (quoting 29 C.F.R. § 1630.2(o)(3)). "If the interactive process was triggered but not successfully resolved, 'courts should attempt to isolate the cause of the breakdown and then assign responsibility.'" *Fisher*, 951 F.3d at 421 (quoting *Kleiber*, 485 F.3d at 871).

Although Gearhart does not dispute that he met with DuPont twice or that the discussions memorialized in the IART are accurate, he nonetheless argues that DuPont failed to participate in the interactive process in good faith.[11] First, as to the proposed accommodation of assigning him to a monomer dumping position, Gearhart alleges that "[t]he interactive process failed when

---

Cale was aware of the job description for Tedlar Operators. On November 8, 2016, the Tedlar area manager and an occupational health specialist spoke to Dr. Cale about Gearhart working in the Tedlar oven, and, following the meeting, Dr. Cale decided, after "review[ing] the differences of the workload/PPE at each location," that "if an employee is restricted from the oven in Kapton, they will be restricted from the oven in Tedlar." (Medical Chart, R. 23-3 at PageID #406.) Dutton also testified that "[w]e . . . made sure that the plant doctor had very granular information" about the similarities between the two jobs. (Dutton Dep., R. 25-1 at PageID #546.) Therefore, Gearhart has not only failed to carry his burden to show that working as a Tedlar Operator was a reasonable accommodation, but his attacks on DuPont's decision-making process for determining that reassignment to this position was not a reasonable accommodation are also unfounded.

[11] One of Gearhart's five Statement of Issues argues that the district court erroneously held that DuPont complied with its duty to participate in the interactive process because "the Trial Court's total discussion of the potential accommodations was limited to the following sentence 'For various reasons, however, none of these accommodations were made.'" (Appellant Brief at 1.) The district court, however, comprehensively discussed, and rejected, Gearhart's arguments in seven detailed paragraphs.

DuPont violated the ADA's undue hardship statutory guidance because DuPont has a blanket prohibition of adding staffing as an accommodation considering any staffing addition, under any circumstance, an undue hardship." (Appellant Brief at 15.) As explained above, however, the proposed accommodation of assigning Gearhart to a role dedicated exclusively to dumping monomers was determined to not be reasonable. Therefore, because an undue hardship analysis is only relevant if the employee proposes a reasonable accommodation, the undue hardship analysis in Gearhart's IART cannot be considered a breakdown of the interactive process.

In any event, as explained above, while the ADA may require an employer to "consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified . . . this duty does not require employers 'to create new jobs.'" *Kleiber*, 485 F.3d at 869 (quoting *Burns*, 222 F.3d at 257). Thus, contrary to Gearhart's argument, DuPont's refusal to create new positions cannot be considered a failure to engage in the interactive process in good faith.

Second, Gearhart also argues that DuPont violated its duty of good faith by failing to include his cardiologist in the interactive process. However, the interactive process "is designed to encourage direct participation on behalf of both the employee and the employer." *Id.* at 871 (citations omitted). While "there is nothing wrong with involving . . . representatives in the interactive process," Gearhart never requested that his cardiologist join the meetings.[12] *Id.* Therefore, DuPont cannot be faulted for Gearhart's cardiologist not attending the meetings.

---

[12] In its response, DuPont stated that "[t]he Court should take judicial notice that Gearhart did not identify Dr. Magorien or provide any medical records from Dr. Magorien (or any other doctors) in response to DuPont's interrogatories and document requests during the District Court proceeding." (Appellee Brief at 33 n.5.) Gearhart then filed a Motion for Judicial Notice asserting that "[t]o rebut Appellee's unsupported, inferential and prejudicial accusations, Appellant has no choice but to go outside the record for reliable, probative and substantial evidence that Appellee's footnote 5 alleging discovery improprieties was an improper attempt to bias this Court against the Appellant." (Motion to Take Judicial Notice at 2–3.) Both parties argue that the documents attached to Gearhart's motion support its position.

Third, Gearhart argues that DuPont did not act in good faith because he was not included when an area manager and an occupational health specialist spoke to Dr. Cale about his request that he be allowed to apply for a Tedlar Operator position. However, the duty to engage in an interactive process does not require the employer to include the employee in every action it takes once the duty is activated. *See* 29 C.F.R. § 1630.2(o)(3) (describing an "an informal, interactive process"). The point of holding the meetings is to ensure "communication and good-faith exploration of possible accommodations," not to impose rigid restrictions on an employer's good-faith efforts to determine whether a reasonable accommodation is available. *Kleiber*, 485 F.3d at 871 (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000)). DuPont did not violate its duty of good faith by exploring whether Gearhart's proposed accommodation was reasonable.

Fourth, Gearhart argues that DuPont failed to engage in the interactive process in good faith because, several years prior, when DuPont engaged in the process with Kim Clark (a former Kapton Casting Operator who, for medical reasons, could no longer work in the oven) DuPont treated her more favorably. However, Gearhart has not provided any support for his proposition that an employer's lack of good faith engagement in the interactive process can be demonstrated simply by pointing to another employee who was allegedly treated better. *Cf. EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018) (explaining that a showing that "similarly situated non-protected employees were treated more favorably . . . is necessary only when there is

However, "[t]his Court traditionally will not take judicial notice of documents in order to allow parties to supplement the record with documents they failed to first present to the district court for consideration." *Goff v. Nationwide Mut. Ins., Co.*, No. 19-4078, 2020 WL 5049380, at *3 (6th Cir. Aug. 27, 2020) (citing *Davis v. City of Clarksville*, 492 F. App'x 572, 578 (6th Cir. 2012)). Moreover, contrary to the requirements of Federal Rule of Evidence 201, the facts that this Court is asked to notice—whether the contents of the documents show that Gearhart complied with his discovery obligations—are "subject to reasonable dispute." *Abu-Joudeh v. Schneider*, 954 F.3d 842, 848–49 (6th Cir. 2020) (quoting Fed. R. Evid. 201(b)). In any event, it is undisputed that before this litigation began DuPont did not have Dr. Magorien's records. Whether Gearhart complied with its discovery obligations is irrelevant for present purposes. Gearhart's motion is therefore denied.

no direct evidence of discrimination."). Rather, DuPont fulfilled its duty by communicating with Gearhart, identifying his limitations, and seeking reasonable accommodations. *See Kleiber*, 485 F.3d at 871. Whether DuPont, several years earlier, had more contact with Clark's doctors than with Gearhart's, or interacted more with Clark herself than with Gearhart, does not demonstrate a lack of good faith.

Finally, Gearhart argues that alleged deficiencies in Dr. Cale's medical opinion violated DuPont's duty to engage in the interactive process in good faith. Absent evidence that DuPont's representatives in the interactive process had reason to believe that Dr. Cale's opinion was deficient, we cannot conclude that DuPont's reliance on Dr. Cale's medical opinion was in bad faith. Moreover, as part of the interactive process, Gearhart could have provided DuPont with a medical opinion allowing him to work in an oven. However, his personal cardiologist's medical opinion aligned with Dr. Cale's.

In sum, no reasonable jury could conclude that Gearhart was qualified for a position at DuPont, with or without a reasonable accommodation, or that DuPont failed to engage in the interactive process in good faith. Accordingly, because Gearhart has not submitted sufficient evidence for a reasonable fact-finder to conclude that DuPont violated the ADA, we affirm the district court's judgment in DuPont's favor.

## CONCLUSION

For the reasons stated above, the judgment of the district court is **AFFIRMED**.